# IN THE SUPREME COURT OF IOWA

No. 21–0744

Submitted September 15, 2022—Filed December 22, 2022

**STATE OF IOWA,**

Appellee,

vs.

**RONALD JAMES BRIMMER,**

Appellant.

---

Appeal from the Iowa District Court for Dubuque County, Thomas J. Bitter, Judge.

A criminal defendant seeks review of the sufficiency of the State's evidence supporting his second-degree sexual abuse conviction and challenges the trial court's decision to close his trial to the public during the COVID-19 pandemic. **REVERSED AND REMANDED.**

Oxley, J., delivered the opinion of the court in which McDonald, J., joined, McDermott and May, JJ., joined except as to part IV.B.2, and Christensen, C.J., and Mansfield and Waterman, JJ., joined as to part III only. Mansfield, J., filed an opinion concurring in part and dissenting in part, in which Christensen, C.J., and Waterman, J., joined. May, J., filed a special concurrence, in which McDermott, J., joined.

Martha J. Lucey, State Appellate Defender, and Vidhya K. Reddy, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Genevieve Reinkoester, Assistant Attorney General, for appellee.

**OXLEY, Justice.**

Criminal jury trials in Iowa and around the country over the last two and a half years would have looked strange to an observer plucked out of prepandemic times. Witnesses speaking through masks and see-through face shields; brightly colored tape on floors every six feet to mark where people could stand; clients sitting at different tables from their attorneys, trying to nonetheless communicate in private; separate "in" and "out" doors to courthouses and courtrooms to direct traffic patterns; juries selected in school gymnasiums or large warehouses; jurors spread out in the back of a courtroom instead of sitting in the jury box. These are but a few of the accommodations courts in Iowa and across the country made in trying to stem the spread of COVID-19 while preventing the wheels of justice from grinding to a halt.

Ronald Brimmer was set to stand trial on serious felony charges on March 31, 2020, but then, well, COVID, and his trial was repeatedly rescheduled. A full year later, at which time Brimmer was in jail awaiting trial, his trial was finally set to go on April 6, 2021. When he requested that his family and friends be allowed to attend trial in person, the answer was "no," not even his mom. The district court considered rearranging the already rearranged courtroom but ultimately concluded that while it could make room for a few people and comply with the COVID protocols this court had previously implemented, anyone allowed in would still be too close to jurors for the court's liking. The district court also dismissed the

option of livestreaming the trial so the public could participate virtually because the judge couldn't navigate that technology by himself.

"[E]ven in a pandemic, the Constitution cannot be put away and forgotten." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020) (per curiam). A public trial is among the most fundamental of constitutional rights—a stalwart feature of a criminal prosecution that distinguishes a free society from "Star Chamber" techniques. *State v. Lawrence*, 167 N.W.2d 912, 913–14 (Iowa 1969) (recognizing the right has been "universally regarded by state and federal courts as basic and substantial, and the language declaring it as mandatory"). It was included in the constitution to "ensure that [it] will not be sacrificed to expediency." *Hudson v. Palmer*, 468 U.S. 517, 556 (1984) (Stevens, J., concurring in part and dissenting in part). And it is our obligation to jealously guard it. *See* 1 Annals of Cong. 439 (1789) (Joseph Gales & William W. Seaton eds., 1834) (statement of Rep. Madison) (envisioning courts as "the guardians of [constitutional] rights; . . . an impenetrable bulwark against . . . every encroachment upon [those] rights" from whatever quarter).

As such, and as the head of the judicial branch, we recognize our responsibility to guide Iowa courts through these unprecedented times. Our concern here is whether Brimmer's constitutionally-protected right to a public trial was violated, not who is to blame. We do not doubt the district court judge's sincere belief that he was doing the best he could under the circumstances, nor do we intend to disparage his efforts, recognizing we have the luxury of unhurried deliberation. But if we, as a branch, failed to

protect Brimmer's rights, then we, as a branch, must own up to that failure. No solution to the COVID conundrum was ideal. But simply closing Brimmer's trial to the public violated his constitutional rights, and that structural error entitles him to a new trial.

## I. Factual Background.

In the summer of 2018, twenty-year-old Ronald Brimmer and thirty-five-year-old Augustin Bon-Orduno (coworkers at John Deere in Dubuque) met sixteen-year-old J.H. during one of her work shifts at a McDonald's drive-through. In the afternoon on July 19, Bon-Orduno answered J.H.'s Snapchat message looking for someone to supply her with alcohol. Bon-Orduno invited Brimmer to hang out with them, and that evening the two went together to pick up J.H., along with her fifteen-year-old sister, N.D., and drove back to Bon-Orduno's house for drinks.

While at the house, the four sat and talked in a bedroom, played music, and drank alcohol. N.D. characterized the music as "decently loud." N.D. only had "sips" of alcohol, while J.H. drank "a bunch." J.H. poured her first drink herself, but Brimmer and Bon-Orduno poured the rest for her. During one instance where the two mixed J.H. a drink, N.D. observed them remain in the kitchen for about three minutes before actually pouring the drink.

At one point, J.H. got up to use the bathroom. She had never consumed much alcohol before and by all accounts was drunk at this point. As she came out of the bathroom, she was accosted by Bon-Orduno. He attempted to kiss J.H. over her protests and eventually forced her back

into the bathroom where he sexually assaulted her as she was bent over the bathtub. Brimmer saw Bon-Orduno kissing J.H. in the hallway but testified he saw no signs of a struggle and believed the kissing was mutual.

Earlier in the evening, Brimmer had sent J.H. a Snapchat message asking if she was interested in a "threesome" with him and Bon-Orduno and, according to his testimony, believed she had agreed. After Bon-Orduno assaulted J.H., he left her on the floor of the bathroom, and Brimmer entered the bathroom shortly after. He asked J.H. if he could touch her and claimed she then "turned around, [and] faced the tub," which he "presumed" meant she was giving her consent to sexual intercourse. He attempted to have sex with J.H. but was unable to get an erection. According to Brimmer, he eventually abandoned his attempt and left the bathroom. According to J.H., he then asked her to give him oral sex. She did not respond but did not comply, and when he finally got an erection, he lifted her up off the tub and sexually assaulted her.

**II. Procedural History.**

On September 20, 2019, Brimmer was charged with second-degree sexual abuse under Iowa Code section 709.3(1)(*c*) (2018), and he pleaded not guilty. Trial was initially scheduled to begin in December 2019. After several continuances at the parties' request, trial was set for March 31, 2020. And then, COVID. Nearly all aspects of life were significantly altered in March 2020 as federal and state authorities grappled with the global pandemic, balancing the need to keep society moving while keeping people

distanced from each other in an attempt to stop the spread of the unknown disease.

In response to the pandemic and Governor Reynolds's Proclamation of Disaster Emergency, State of Iowa Exec. Dep't, *Proclamation of Disaster Emergency* (Mar. 9 2020), https://governor.iowa.gov/sites/default/files/documents/202003100818.pdf [https://perma.cc/JV4T-94NL], this court, similar to courts across the country, issued a supervisory order directing district courts to reschedule any criminal jury trial not yet in progress to "a date no earlier than April 20." Iowa Sup. Ct. Supervisory Order, *In the Matter of Ongoing Preparation for Coronavirus/COVID-19 Impact on Court Services* 1 (Mar. 14, 2020).[1] In April, we again delayed trials until mid-July. Iowa Sup. Ct. Supervisory Order, *In the Matter of Ongoing Preparation for Coronavirus/COVID-19 Impact on Court Services* 3 (Apr. 2, 2020). And then again in May, we delayed trials until September. Iowa Sup. Ct. Supervisory Order, *In the Matter of Ongoing Provisions for Coronavirus/COVID-19 Impact on Court Services* 4 (May 22, 2020). Although we briefly allowed in-person trials to resume in September, we again postponed trials in November until a time "no earlier than February 1, 2021." Iowa Sup. Ct. Supervisory Order, *In the Matter of Ongoing Provisions for Coronavirus/COVID-19 Impact on Court Services* 1 (Nov. 10, 2020).

---

[1]All of this court's COVID-19 related administrative orders are available online at https://www.iowacourts.gov/iowa-courts/supreme-court/orders/.

When it was possible to conduct jury trials, courts across the country had to make adjustments to normal procedures. To that end, this court issued guidance on how to safely resume in-person trials while still honoring defendants' constitutional rights, including the right to an open trial. *See* Iowa Sup. Ct. Supervisory Order, *In the Matter of Resuming In Person Court Services During COVID-19* (July 9, 2020) [hereinafter *July 9 Supervisory Order*]. In accordance with the Centers for Disease Control and Prevention's (CDC) then-existing guidance on preventing the spread of COVID-19,[2] we required courts to maintain six feet of distance between persons in courtrooms, which in turn meant courts had to limit public attendance "as physically-distanced space permit[ted]." *Id.* at 4. If that resulted in no room available for the public, we directed courts to "set up live feeds of public court proceedings in another room in the courthouse (or, as necessary, streaming online or by videoconference) to permit simultaneous viewing." *Id.* at 4–5.

For Brimmer, all of this meant that his trial did not begin until April 6, 2021.[3] And, when it did begin, the court had to physically distance

---

[2]*See* Ctrs. for Disease Control & Prevention, *How to Protect Yourself & Others* (updated April 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/
prevention.html [https://web.archive.org/web/20200709054401/https://www.cdc.gov/
coronavirus/2019-ncov/prevent-getting-sick/prevention.html].

[3]After his arrest on September 11, 2019, Brimmer's bond was set at $50,000. He could not make bond at that amount, or the $25,000 it was reduced to in October. In June 2020, it was further reduced to $10,000, which Brimmer posted in August. After a violation of his release conditions just two months later, however, Brimmer was returned to jail to await trial. Overall, then, nineteen months elapsed between Brimmer's initial arrest and his trial, seventeen of which Brimmer spent in jail without having been convicted of any crime.

venire members in the "gallery" of the courtroom (where the public typically sits), leaving little—but still some—space for public spectators. As the court explained when first considering closing Brimmer's trial:

> The only setup that we have that can accommodate a jury trial in our county is to spread the jurors out evenly in the back of the courtroom behind the bar. Therefore, if we had any people from the public . . . those people would have to sit very close to -- either right next to or right behind the jurors. The couple of jury trials that we've done up to this point, we've simply closed the trial to the public, and I know that is not ideal, but most important to me is that we get a fair trial in this case . . . and we want the jurors to feel, number one, that they don't have people sitting too close to them during this time of Covid, and, number two, that we don't have people sitting close enough to the jurors that the jurors either hear something they shouldn't hear or that the jurors feel in some way intimidated by either side.

Just prior to jury selection the next day, Brimmer's counsel again brought up his right to a public trial, "requesting that the public be allowed in" and objecting if it was not.

The court's plan for jury selection was to stagger two venire panels to avoid having the full venire present in the courtroom all at once: one panel of twenty jurors and another of seventeen. In the first set, eighteen jurors were spread out in the gallery and two were seated in the jury box. In the second set, twelve jurors were spread out in the gallery and five sat in the jury box.

In response to Brimmer's objection to excluding members of the public, the court again acknowledged that it could fit some spectators in the courtroom but that it would be "really, really difficult . . . because the jurors [would] be evenly spaced out in the back of the courtroom, [meaning] anybody from the public [would] be seated very close to the

jurors." The court was not comfortable with that option because it "want[ed] the jurors to feel like it's safe and [to not] overhear anything [or] feel intimidated in any way." When Brimmer's counsel pointed out that there would be more space in the courtroom after jury selection (the court planned to seat fourteen jurors for the trial) and asked for clarification as to whether the courtroom would still be closed at that time, the court answered in the affirmative, explaining:

> [B]oth times the jurors are going to sit spaced out in the back of the courtroom, and with a criminal jury, we're going to have 14 jurors so they're going to fill up that back of the courtroom. I walked around there yesterday. The only place we could possibly fit public would be those benches against the back windows and even there, they're going to be seated about six feet behind the second row of jurors, and I'm not -- I'm just not comfortable with that. I don't want -- even if somebody says something unintentionally by reaction without any intention to cause any influence, I don't want the jurors seated that close to the public where they can overhear something that they shouldn't hear. So, yes.

The court did consider electronically livestreaming the trial but said it did not "have that capability" and therefore would not do so unless "the State want[ed] to provide somebody to do that." Brimmer did not comment one way or the other about the livestreaming option. The district court also suggested that Brimmer waive his speedy-trial right in order to postpone trial to an unspecified time when physical distancing requirements were more relaxed; an offer Brimmer declined. When the court later said it would make room for the victim advocate in the jury box at the State's request, Brimmer requested that the court allow his mother in—"just one person, during trial"—which the court refused to do. It explained that the

advocate had "a purpose with this trial" and was not considered part of the public.

After jury selection was finished, but just before trial began, the court excused a juror for a personal conflict, leaving just thirteen jurors seated in the gallery during trial. Both jury selection and the entire trial were completely closed to public spectators, and no electronic recording or livestream was made available so the public could watch remotely.

Trial proceeded over the next three days. The jury found Brimmer guilty, and in May 2021 Brimmer was sentenced to an indeterminate twenty-five-year sentence. Brimmer appeals, asking this court to find a violation of his constitutional right to a public trial. He separately challenges the sufficiency of the evidence to support his conviction. We retained the appeal.

### III. Sufficiency of the Evidence to Support Second-Degree Sexual Abuse Under Section 709.3(1)(*c*).

We address Brimmer's challenge to the sufficiency of the evidence first, as it could provide him greater relief than the new trial he seeks for his public trial challenge. In his sufficiency argument, Brimmer challenges only the State's evidence to establish that he was aided and abetted by another, which enhanced his conviction from third-degree sexual abuse, a class "C" felony, *see* Iowa Code § 709.4(2), to second-degree sexual abuse, a class "B" felony, *see id.* § 709.3(1)(*c*), (2). If the State presented insufficient evidence to support the enhancement, Brimmer is entitled to dismissal of the second-degree charge, entry of conviction on the lesser included third-degree charge (which he does not otherwise challenge), and

resentencing. *See State v. Chapman*, 944 N.W.2d 864, 875 (Iowa 2020) ("If the State fails to present sufficient evidence to convict a defendant at trial, the Double Jeopardy Clause prevents the State from trying to prove its case in a second trial."); *State v. Ortiz*, 905 N.W.2d 174, 183 (Iowa 2017) ("The remedy under our precedent is to remand this case for entry of a judgment of conviction for the lesser offense of third-degree robbery and resentencing.").

**A. Standard of Review for Sufficiency Challenges.** "We review the sufficiency of the evidence for correction of errors at law." *State v. Crawford*, 972 N.W.2d 189, 202 (Iowa 2022) (quoting *State v. Buman*, 955 N.W.2d 215, 219 (Iowa 2021)). Evidence is sufficient to sustain a verdict if it is "substantial." *Id.* "Substantial evidence," in turn, "is evidence sufficient to convince a rational trier of fact the defendant is guilty beyond a reasonable doubt." *Id.* "In determining whether the jury's verdict is supported by substantial evidence, we view the evidence in the light most favorable to the State, including all 'legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.' " *Id.* (quoting *State v. Tipton*, 897 N.W.2d 653, 692 (Iowa 2017)). It is not our place "to resolve conflicts in the evidence, to pass upon the credibility of witnesses, to determine the plausibility of explanations, or to weigh the evidence; such matters are for the jury." *State v. Musser*, 721 N.W.2d 758, 761 (Iowa 2006) (quoting *State v. Williams*, 695 N.W.2d 23, 28 (Iowa 2005)). It is also for the jury to decide which evidence to accept or reject. *See Williams*, 695 N.W.2d at 28. Finally, we

recognize that circumstantial evidence is as probative as direct evidence. *See State v. Ernst*, 954 N.W.2d 50, 57 (Iowa 2021).

**B. Aiding and Abetting Another to Commit Sexual Abuse.** As relevant here, sexual abuse is elevated to a second-degree offense if the abuser is "aided or abetted by one or more persons" and the offense is committed against the victim's will. Iowa Code § 709.3(1)(*c*). While "sometimes called the 'gang rape' statute," *State v. Finnigan*, 478 N.W.2d 630, 632 (Iowa 1991), it is not limited to the colloquial understanding of that term. Rather, we apply our aiding-and-abetting jurisprudence to determine whether the State provided sufficient evidence that Brimmer was "aided or abetted by one or more persons," Iowa Code § 709.3(1)(*c*), namely, Bon-Orduno.

Brimmer does not challenge the trial court's instructions to the jury, which establish the law of the case for our review:

> "[A]id and abet" means to knowingly approve and agree to the commission of a crime, either by active participation in it or by knowingly advising or encouraging the act in some way before or when it is committed. Conduct following the crime may be considered only as it may tend to prove the defendant's earlier participation. Mere nearness to, or presence at, the scene of the crime, without more evidence, is not "aiding and abetting". Likewise, mere knowledge of the crime is not enough to prove "aiding and abetting".

*See also State v. Neiderbach*, 837 N.W.2d 180, 211 (Iowa 2013) (requiring substantial evidence that the abettor "assented to or lent countenance and approval to the criminal act either by active participation or by some manner encouraging it prior to or at the time of its commission" (quoting *State v. Spates*, 779 N.W.2d 770, 780 (Iowa 2010))).

Aiding and abetting therefore contains both a mens rea, or knowledge, component, as well as an actus reus, or conduct, component through active participation or advising and encouraging. *See id.*; *see also People v. Perez*, 113 P.3d 100, 104 (Cal. 2005) (identifying three elements to establish aiding and abetting: "(a) the direct perpetrator's actus reus— a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime").

Proof may be supplied directly or through "circumstantial evidence including presence, companionship and conduct before and after the offense is committed." *State v. Miles*, 346 N.W.2d 517, 520 (Iowa 1984) (quoting *Fryer v. State*, 325 N.W.2d 400, 406 (Iowa 1982)) (using circumstantial evidence to infer participation); *see State v. Lewis*, 514 N.W.2d 63, 66 (Iowa 1994) (quoting *Miles* as support for using circumstantial evidence to infer participation); *see also State v. Henderson*, 908 N.W.2d 868, 878 (Iowa 2018) ("[K]nowledge can be proved by circumstantial evidence."). Brimmer argues the State failed to provide evidence to support a finding that Bon-Orduno both knew that Brimmer was going to assault J.H. and that he actively participated in or encouraged Brimmer's assault. In short, he asserts the evidence establishes only that two assaults were committed, wholly independent of one another.

Under the court's jury instruction, the mens rea of aider and abettor liability requires "*knowingly* advising or encouraging the [principal] act." (Emphasis added.) The knowledge element requires the abettor to be aware of the underlying offense "at the time of or before its commission." *Henderson*, 908 N.W.2d at 876 (quoting *State v. Tangie*, 616 N.W.2d 564, 574 (Iowa 2000) (en banc)). In *State v. Ledezma*, for example, the court of appeals rejected a sufficiency challenge where "it [was] clear all three men knew[, including the defendant, that the victim] was struggling and resisting her confinement" prior to the men assaulting her. 549 N.W.2d 307, 312 (Iowa Ct. App. 1996).

Here, although there was no direct evidence presented on the issue of Bon-Orduno's prior knowledge of Brimmer's intended actions, the State presented sufficient circumstantial evidence from which a rational juror could infer Bon-Orduno knew Brimmer intended to commit a nonconsensual sex act with J.H. prior to or during its commission. Brimmer testified he believed J.H. had agreed to have a threesome with him and Bon-Orduno, a scenario the jury could reasonably infer Brimmer shared with Bon-Orduno. Brimmer would have had time to do so during the several minutes the two spent in the kitchen pouring another alcoholic drink for J.H. Importantly, J.H. testified she rejected Bon-Orduno's advances when he attempted to kiss her in the hall before he then pushed her into the bathroom and sexually assaulted her. The jury could have inferred from the hallway interaction both that Brimmer told Bon-Orduno about his threesome Snapchat conversation with J.H. and that J.H.'s

rejection made clear to Bon-Orduno that any sexual encounter with J.H. would be nonconsensual. In addition, N.D. testified that while J.H. was in the bathroom—after Bon-Orduno had assaulted J.H. and come out of the bathroom—Bon-Orduno came into the bedroom where N.D. was listening to music and talked to her about music and her interest in singing, offering to help her possibly get a record deal with an acquaintance in California. This would have been during the time that Brimmer was in the bathroom with J.H. Brimmer also testified that after he left J.H. in the bathroom, he "went and got [Bon-Orduno] and told him what was going on." Bon-Orduno did not appear to be surprised, instead asking N.D. to check on her sister who had been in the bathroom for a while, suggesting J.H. might have fallen off the toilet. The jury could conclude from this evidence that Bon-Orduno had nonconsensual sex with J.H. knowing that Brimmer intended to do the same.

In addition to proving Bon-Orduno had the requisite mens rea to be an aider or abettor, the State also needed to present sufficient evidence of his actus reus, or conduct. The jury was instructed the conduct element is met by a person "active[ly] participat[ing] in" or "advising or encouraging the act in some way before or when it is committed." This element is important because "neither knowledge nor proximity to the scene is—standing alone—enough to prove aiding and abetting." *Lewis*, 514 N.W.2d at 66.

Consistent with its reputation as "the 'gang rape' statute," *Finnigan*, 478 N.W.2d at 632, cases under section 709.3(1)(*c*) often involve an

abettor who was physically present during the principal's crime and who actively participated in it, either by conducting their own assault on the victim or by restraining or instructing the victim in some way during the principal's assault. *See, e.g.*, *State v. Williams*, 574 N.W.2d 293, 295–96 (Iowa 1998) (rejecting sufficiency challenge where victim was assaulted by defendant and three others, all of whom took turns holding the victim down while another assaulted her); *Finnigan*, 478 N.W.2d at 631–32 (rejecting sufficiency challenge where defendant assisted her husband in assaulting the couple's daughter by initiating and directing sex acts, photographing the acts, and making and enforcing threats for noncompliance); *Ledezma*, 549 N.W.2d at 312 (rejecting sufficiency challenge where defendant continued to drive vehicle while the victim was obviously struggling to get away, parked the car and observed as the victim was assaulted, perpetrated his own assault against the victim, and observed as a third person assaulted the victim). However, this does not mean that level of involvement is necessarily required.

Again, while the State's evidence may be circumstantial, it is sufficient to allow the jury to conclude that Bon-Orduno's acts throughout the evening encouraged Brimmer to sexually assault J.H. Brimmer testified that he saw Bon-Orduno kissing J.H. outside the bathroom. After Bon-Orduno assaulted J.H. and left the bathroom, Brimmer went into the bathroom where he found J.H., in the dark and lying half-naked over the bathtub, and attempted to engage in sexual intercourse with her. N.D.'s testimony that Bon-Orduno checked in on her while J.H. was in the

bathroom and engaged her in conversation supports the reasonable inference that Bon-Orduno was distracting N.D.[4] Put simply, the jury could have found from these facts that Bon-Orduno first assaulted J.H. and left her in the bathroom and then distracted N.D. to provide cover for Brimmer to have his turn with J.H. The jury could also have found that Bon-Orduno's actions emboldened Brimmer to do the same, a classic example of a gang rape. *Cf. State v. Shorter*, 893 N.W.2d 65, 74 (Iowa 2017) (noting that in another case, the "[defendant]'s striking [the victim] while a [hostile] crowd formed was sufficient to support a finding of encouragement of subsequent acts" by the crowd, for aider and abettor liability to attach to the defendant (discussing *State v. Tyler*, 873 N.W.2d 741, 750–51 (Iowa 2016), *superseded by statute on other grounds*, 2019 Iowa Acts ch. 140, § 32 (codified at Iowa Code § 814.28 (2020)))).

The evidence supported the inferences needed to sustain the jury's findings. We therefore reject Brimmer's challenge to the sufficiency of the evidence supporting his conviction for second-degree sexual abuse.

**IV. Constitutional Right to a Public Trial.**

We turn next to Brimmer's challenge to the district court's exclusion of all members of the public, including his family, from his trial as a violation of his constitutional rights.

---

[4]We recognize that the audio of J.H.'s interview with the police from Exhibit 40 was not provided to the jury, so we do not rely on that recording here. However, N.D.'s testimony provides the necessary evidence from which the jury could have found that Bon-Orduno engaged her in conversation while Brimmer was assaulting J.H. That Bon-Orduno was actively distracting N.D. is a reasonable inference from this evidence.

**A. Standard of Review & Error Preservation.** "Our review of th[e] constitutional [public trial] question is de novo in light of the totality of the circumstances." *State v. Schultzen,* 522 N.W.2d 833, 835–36 (Iowa 1994).

The State correctly points out that error preservation requires both a specific objection to an alleged error at trial and a ruling on the issue, *see Meier v. Senecaut,* 641 N.W.2d 532, 537 (Iowa 2002) ("[I]ssues must ordinarily be both raised and decided by the district court before we will decide them on appeal."), which is precisely what occurred here. Defense counsel specifically "object[ed] if the public is disallowed," and the district court ruled that "logistically it's not going to work to have people in from the public." The requirements of error preservation were met at that time, and no further action was required.

The State nonetheless makes a less-than-enthusiastic assertion that Brimmer "[a]rguably . . . abandoned" his objection to the district court's closure of the courtroom when he asked that at least his mother be allowed to attend and that it "appear[ed]" that the district court did not affirmatively rule on that more limited request, such that Brimmer's challenge to his public trial right was not preserved for review. The State is right to equivocate. Unlike in the cases it cites, *see, e.g., People v. Poe,* No. A160102, 2021 WL 5578080, at *2 (Cal. Ct. App. Nov. 30, 2021) (concluding that defendant failed to preserve error after court denied his request for family to be allowed in courtroom during sentencing by responding only "Okay" without further objection or mention of public trial right); *State v. Richardson,* No. 2020–T–0037, 2021 WL 4477645, at *6

(Ohio Ct. App. Sept. 30, 2021) (finding error unpreserved where defendant never "formally object[ed]" but merely "asked the court to 'consider' permitting family members to speak in mitigation" at his sentencing hearing but "did not revisit the issue or object to the court proceeding to sentencing"), Brimmer's counsel formally objected on the basis of his public trial right three times: the day before trial, the day of trial before jury selection, and again after jury selection when he asked that just his mom be allowed. Notably, this request followed immediately after the court said it would allow the victim advocate to sit in the jury box during the victim's testimony. The court clearly and affirmatively rejected Brimmer's objections, even allowing Brimmer to make a record on the issue. The court responded to Brimmer's final request to at least allow one person in the room by asking if he had considered the offer to waive his speedy trial right and continue trial to a future, unknown date once physical distancing was relaxed. When Brimmer declined that offer, the court asked, "Anything else from the defense?" and then proceeded to trial.

The State cites no caselaw supporting its proposition that requesting a limited alternative to complete closure waived or forfeited the objection altogether. This argument might hold more sway if the court had granted Brimmer's limited request to allow at least his mother into the courtroom and Brimmer now claimed the court violated his rights by not providing greater public access. But where the district court denied even that more limited alternative, we cannot say he gave up his original objection by merely asking for a compromise, especially where the court had just said

the victim advocate could sit in the jury box. Even in the context of evidentiary objections raised in a pretrial motion in limine, we find waiver of the objection only if counsel affirmatively states "no objection" when the evidence is later offered at trial. *Compare State v. Schmidt*, 312 N.W.2d 517, 518 (Iowa 1981) (holding that counsel waived any error by "affirmatively stat[ing]—twice—that he had no objection to the very evidence whose admission he now says amounted to reversible error"), *with State v. Brown*, 656 N.W.2d 355, 361 (Iowa 2003) (distinguishing *Schmidt* as having "ar[isen] from [a] situation[] in which the defendant, through trial counsel, *affirmatively* consented to the admission of specific testimony or other evidence at trial that had been subject to a prior objection" and holding error was preserved where defendant "did not affirmatively and specifically consent to the admission of [challenged] testimony").

"The preservation of error doctrine is grounded in the idea that a specific objection . . . be made known, and the trial court be given an opportunity to pass upon the objection and correct any error." *Brown*, 656 N.W.2d at 361. The district court here fully understood the nature of Brimmer's objection and definitively overruled it. Error was preserved. *See State v. Thoren*, 970 N.W.2d 611, 621 (Iowa 2022) (recognizing that if the district court's ruling leaves "no question about its finality," the issue is preserved for appeal).

**B. Analysis of the Public Trial Right Issue.** Both the United States and Iowa Constitutions provide a criminal defendant with the "right to a

speedy and public trial." U.S. Const. amend. VI; Iowa Const. art. I, § 10. "Public trial" means just what it says: a defendant is entitled to have his trial "open to all who care to observe." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 564 (1980) (plurality opinion); *see also Davis v. United States*, 247 F. 394, 395 (8th Cir. 1917) (per curiam) ("As the expression necessarily implies, a public trial is a trial at which the public is free to attend."). "[A]t the very least," the right to a public trial entitles a criminal defendant "to have his friends, relatives and counsel present, no matter with what offense he may be charged." *In re Oliver*, 333 U.S. 257, 272 (1948).

The protections provided by the right to a public trial are unparalleled as a bedrock principle of criminal procedure. Throughout the centuries-long evolution of the modern criminal trial, during which "great changes in courts and procedures took place," the requirement of an open trial remained a constant. *Richmond Newspapers*, 448 U.S. at 564–66 (discussing the history of open trials dating before the Norman Conquest). It ensures "that the public may see [the defendant] is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions." *In re Oliver*, 333 U.S. at 270 n.25 (quoting Thomas M. Cooley, *Constitutional Limitations* 647 (8th ed. 1927)). "The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of

judicial power." *Sothman v. State*, 967 N.W.2d 512, 528 (Iowa 2021) (quoting *In re Oliver*, 333 U.S. at 270).

The purposes behind the public trial right are best served "by the public's ability to [literally] observe the trial." *United State v. Allen*, 34 F.4th 789, 795 (9th Cir. 2022); *see also State v. Bell*, No. A20–1638, 2021 WL 6110117, at *4 (Minn. Ct. App. Dec. 27, 2021) ("[P]revious opinions indicate that the physical *presence* of the public observing the trial is part of the public trial expectation."), *further rev. granted*, No. A20–1638 (Minn. Mar. 15, 2022). "Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account. Recordation, appeal, whatever other institutions might present themselves in the character of checks, would be found to operate rather as cloaks than checks; as cloaks in reality, as checks only in appearance." *In re Oliver*, 333 U.S. at 271 (quoting 1 Jeremy Bentham, *Rationale of Judicial Evidence* 524 (1827)). It is only in its steadfast observation that the public trial right is preserved. *See United States v. Kobli*, 172 F.2d 919, 924 (3d Cir. 1949) ("We are in duty bound to preserve the [public trial] right as it has been handed down to us and this we will do only if we make sure that it is enforced in every criminal case, even in such a sordid case as the one now before us."); *Davis*, 247 F. at 395 ("The corrective influence of public attendance at trials for crime was considered important to the liberty of the people, and it is only by steadily supporting the safeguard that it is kept from being undermined and finally destroyed.").

The right is not absolute, however, and "may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *Waller*, 467 U.S. at 45.[5] "Such circumstances will be rare, however, and the balance of interests must be struck with special care." *Id.* That fully closed trials are the rare exception is reflected in the Supreme Court's admonition: a presumption of openness may be "overcome only by an *overriding interest* based on findings that *closure is essential* to preserve higher values and is *narrowly tailored* to serve that interest." *Id.* (emphases added) (quoting *Press-Enter. Co. v. Superior Ct. of Cal., Riverside Cnty.*, 464 U.S. 501, 510 (1984)). A court may only close a trial to the public if:

1. The party seeking closure identifies an "overriding interest that is likely to be prejudiced";

2. The closure is "no broader than necessary to protect that interest";

---

[5]The right to a public trial can, like other constitutional rights, also be waived or forfeited if not timely raised in district court, which is what happened in a number of cases around the country during the pandemic. Defendants who failed to preserve error were consistently denied relief either under plain-error review or as waived or forfeited error. *See, e.g., Pulczinski v. State*, 972 N.W.2d 347, 356 (Minn. 2022) (holding, as a matter of first impression, that plain-error review applies to unobjected-to public trial claims despite it being a structural error and that defendant was not entitled to relief under that standard); *Dallas v. State*, No. 384, Sept. Term, 2021, 2022 WL 304007, at *5–10 (Md. Ct. Spec. App. Feb. 2, 2022) (refusing to apply even plain-error review to defendant's unpreserved claim of public trial violation); *Poe*, 2021 WL 5578080, at *2 ("Poe's 'failure to object' forfeited 'his right [to have his family present at sentencing] . . . preclud[ing] any subsequent challenge by him of an order excluding the public.'" (alterations and omission in original) (quoting *People v. Virgil*, 253 P.3d 553, 578 (Cal. 2011))); *People v. Hernandez*, 488 P.3d 1055, 1063 (Colo. 2021) (en banc) (holding that the defendant waived his claim of error by failing to "raise th[e] argument below," without reviewing for plain error).

3. The trial court considers "reasonable alternatives to closing the proceeding"; and

4. The trial court "make[s] findings adequate to support the closure."

*Id.* at 48.[6] We apply this standard to the parallel public trial right under article I, section 10 of the Iowa Constitution. *See Sothman*, 967 N.W.2d at 528–29, 529 n.3; *Schultzen*, 522 N.W.2d at 836.

No doubt, the COVID-19 pandemic presented serious issues for safely holding jury trials. Courts have universally agreed that "[s]temming the spread of COVID-19 is unquestionably a compelling interest" that satisfies the first *Waller* prong. *Allen*, 34 F.4th at 797 (alteration in original) (quoting *Roman Cath. Diocese of Brooklyn*, 141 S. Ct. at 67); *see also United States v. Davis*, No. 3:18–cr–00131–TMB–MMS, 2021 WL 2020479, at *1 (D. Alaska May 20, 2021) ("[T]here is a substantial reason for the partial closure. In order to reduce the spread of COVID-19, the District of Alaska currently has protocols in place to protect the health and safety of the parties, jurors, witnesses, court staff, and public."); *Henson v. Commonwealth*, No. 2020–SC–0343,

---

[6]The district court here did not explicitly analyze the *Waller* factors before ordering its closure, but its "on-the-record description of the courtroom and its findings regarding" Brimmer's public trial objection "implicitly address the *Waller* factors" sufficiently to permit appellate review. *State v. Modtland*, 970 N.W.2d 711, 721 (Minn. Ct. App. 2022). That said, "[g]oing forward, we encourage district courts to make explicit *Waller* findings on the record when they limit courtroom access." *Id.* at 723; *see also Presley v. Georgia*, 558 U.S. 209, 215 (2010) (noting that "in those cases [in which the facts may justify a courtroom closure], the particular interest [justifying closure], and threat to that interest, must 'be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered'" (quoting *Press-Enter.*, 464 U.S. at 510)).

2021 WL 5984690, at *3 (Ky. Dec. 16, 2021) ("Public-health guidance at that time advised social distancing, masking, and quarantining as the primary means of defense from the virus. . . . Without [courtroom] closure[s], the social distancing prescribed by the Centers for Disease Control would have been impossible to maintain."); *Commonwealth v. Masa,* No. 1981CR0307, 2020 WL 4743019, at *3–5 (Mass. Dist. Ct. Aug. 10, 2020) ("There remains a public health emergency in Massachusetts due to the continuing spread of a novel coronavirus . . . ." (footnote omitted)).

We join those courts on this point. Our court—along with courts across the country—placed a moratorium on jury trials for certain time periods during the pandemic. Yet, we remained acutely aware of the peril to defendants, protected by their constitutional rights to both a speedy and a public jury trial, who, like Brimmer, were stuck in jail awaiting trial until it was deemed safe enough to resume in-person court proceedings. Even when trials resumed, limiting public gatherings was still a significant concern, and things like face masks, physical distancing, and COVID questionnaires had become part and parcel of everyday life. Thus, the pandemic is an overriding interest that supports the court's decision to limit the public's access to Brimmer's trial.

But identifying an overriding interest is only the first step to closing a trial to the public. The district court was also required to tailor any closure so that it was "no broader than necessary to protect" the identified

interest and to consider—and adopt—any reasonable alternatives to a complete closure. *Waller*, 467 U.S. at 48.

1. *The district court's exclusion of Brimmer's family was not narrowly tailored.* As trials resumed, courts around the country adopted measures to balance COVID precautions with defendants' rights, and many subsequently faced constitutional challenges to their modified trial proceedings. Some courts reconfigured their courtrooms to make space for at least a limited number of people to attend while maintaining physical distancing requirements, as Brimmer requested here.[7] Others provided alternative means for the public to observe proceedings, such as livestreaming a video or audio feed to another location within the courthouse or over the internet, so that members of the public could view, or in some instances at least listen, to the trial as it was happening. Courts utilized YouTube, local television broadcasts, and Zoom teleconferencing platforms to provide virtual access to the public in real time.[8]

---

[7]*See, e.g.*, *United States v. Holder*, No. 18–cr–00381–CMA–GPG–0, 2021 WL 4427254, at *9–10 (D. Colo. Sept. 27, 2021) (rejecting motion for new trial on basis of violating public trial rights where court allowed limited in-person public access and audio livestreaming via telephone); *United States v. Johnson*, No. 1:21CR123, 2021 WL 3011933, at *1–2 (N.D. Ohio July 16, 2021) (addressing demand for public trial by opening trial to limited number of in-person spectators and livestreaming trial to another courtroom); *United States v. Bledson*, No. 2:20–cr–99, 2021 WL 1152431, at *2–3 (M.D. Ala. Mar. 25, 2021) (addressing public trial limitation by allowing defendant's family to attend trial in person and providing access to other members of the public through audiovisual livestream to a separate courtroom and online).

[8]*See, e.g.*, *United States v. Rosenschein*, 474 F. Supp. 3d 1203, 1210 (D.N.M. 2020) (concluding that "provid[ing] the public with appropriate electronic access to the hearing" through Zoom satisfied defendant's public trial rights during the pandemic); *Vazquez Diaz v. Commonwealth*, 167 N.E.3d 822, 838–41 (Mass. 2021) (holding a sentencing hearing was not closed to the public where it was conducted entirely via Zoom made accessible to the public "either through a Zoom link where nonparticipants' video displays are turned off and sound is muted, or through an audio-only telephone line," reasoning "there [was] no limit on who or how many individuals [could] virtually or telephonically attend the hearing"); *Peters v. State*, No. 82437, 2022 WL 17367580, at *1

While most courts have upheld these various modifications to a public trial challenge when scrutinized under the *Waller* test, virtually all of those cases involved only a partial closure. *Cf. Schultzen*, 522 N.W.2d at 836 (distinguishing a full closure from a "quasi closure" and applying the *Waller* test to conclude the quasi-closure at issue was both no broader than necessary to protect the identified overriding interest and a reasonable alternative to entirely closing the proceeding to the public). But here, *all* members of the public were excluded from in-person participation, *and* no live video, or even audio, feed of the trial was made available.

We have located only three pandemic-related cases where the courtroom was deemed to be fully closed to the public. Two cases found no public trial violation, *see Poe*, 2021 WL 5578080, at *3–4; *Henson*, 2021 WL 5984690, at *4, and one did, *see Allen*, 34 F.4th at 800, but both cases upholding complete closures are readily distinguishable.

In *People v. Poe*, a California trial court closed a sentencing hearing to "the public—including Poe's family." 2021 WL 5578080, at *1. Putting aside Poe's failure to preserve error, the court of appeals noted it still would

(Nev. Nov. 30, 2022) (concluding public trial rights were preserved where district court "provided the live stream alternative to ensure the right to a public trial was afforded"); *Williams v. State*, ___ S.W.3d ___, ___, ___, 2022 WL 4490406, at *1, *11 (Tex. Crim. App. Sept. 28, 2022) (rejecting public trial challenge to exclusion of defendant's brother during testimony of one witness where the brother was still allowed to view the testimony via a livestream in an adjacent courtroom and describing the livestreaming accommodation as "the defining feature of this case"); *State v. Williams*, No. 55269–8–II, 2022 WL 3043541, at *4 (Wash. Ct. App. Aug. 2, 2022) (concluding trial was not truly "closed" where public was provided access through Zoom, YouTube, and local television broadcast even though YouTube channel went down during a portion of the trial); *Lappin v. State*, 171 N.E.3d 702, 704–07 (Ind. Ct. App. 2021) (affirming trial court's decision to limit public observation of voir dire to an audio-only livestream broadcast to the courthouse lobby).

have found no public trial violation given that "the [trial] court's health and safety concerns presented an adequate basis for its decision." *Id.* at *3. *Poe*'s full closure is materially distinguishable in a number of ways. The defendant there did not contemporaneously raise his public trial rights to give the district court an opportunity to consider alternatives to complete closure, the hearing was a sentencing hearing rather than a full trial, and—most importantly—the hearing took place on March 27, 2020, at the very beginning of the pandemic. *See id.* CDC guidance was unclear and changing daily, and courts had not had time to establish alternative practices for allowing public access to court hearings while complying with CDC guidelines.

*Henson v. Commonwealth* likewise involved a trial held at the beginning of the pandemic. 2021 WL 5984690, at *1. Jury selection began on March 12, 2020, the same day the Kentucky Supreme Court issued Administrative Order 2020-08, to be implemented starting the following Monday, March 16. *Id.* at *1–2. In compliance with the Order, the trial "court limited attendance of the trial to attorneys, parties, and necessary witnesses" beginning on March 16. *Id.* at *2. In addressing Henson's public trial challenge to the court's exclusion of his family and friends, the Kentucky Supreme Court was placed in the unenviable position of analyzing the *Waller* factors as applied to its own administrative order. *Id.* at *3 ("[O]ur analysis considers whether the Kentucky Supreme Court fulfilled the *Waller* test in issuing Order No. 2020-08."). The court recognized that while "technologies are [currently] available that provide

streaming of proceedings live to any computer or phone with access to the internet[,] . . . Kentucky's courts were not equipped with such technology at the outset of the COVID-19 pandemic," leaving only "the options of full closure, closure to spectators, or full access to the public." *Id.* Because it found the administrative order "satisfie[d] the elements of the *Waller* test[,] . . . the trial court's adherence with [it] did not constitute a denial of Henson's right to a public trial." *Id.* at \*4. Even though *Henson* upheld a full closure, its reason for doing so—that the district court was faced only with "the options of full closure, closure to spectators, or full access to the public," *id.* at \*3—is inapposite here.

Brimmer's trial commenced on April 6, 2021, two months after jury trials in Iowa resumed the second time. By then, jury trials had been conducted across the state under our *July 9 Supervisory Order* for a total of four months—two months in 2020 and another two months starting in February 2021. That order gave clear direction for courts to permit public attendance as space allowed and to livestream trials when it did not. *July 9 Supervisory Order* 4. The district court judge considered Brimmer's objection to excluding his family and friends, walking around the courtroom to study whether space could be made available for the public, and ultimately concluded that limited space was available. Clearly, then, there were more options than just full closure or nothing. Nevertheless, the district court in Dubuque County "simply closed the trial to the public." This complete "closure was far more extensive than necessary." *Waller,* 467 U.S. at 49; *cf. Bell,* 2021 WL 6110117, at \*3–4 (explaining the

district court only closed the courtroom to in-person spectators and set up livestreaming "after collaborating 'extensively with public health officials to institute safety protocols to protect all necessary parties' " and concluding it "could not safely accommodate any spectators—not even one—within the courtroom while maintaining the protections in place to protect all participants from the COVID-19 pandemic").

When considering the necessary extent of a closure, "the balance of interests must be struck with special care." *Waller*, 467 U.S. at 45. *Waller*'s narrow tailoring requirement means the district court must "show that reasonable alternative measures 'would fail to achieve the [overriding] interest[], not simply that the chosen route is easier.' " *Allen*, 34 F.4th at 799 (quoting *McCullen v. Coakley*, 573 U.S. 464, 495 (2014)); *Presley v. Georgia*, 558 U.S. 209, 215 (2010) (per curiam) ("Trial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials."). Thus, courts must fashion closures to the least-restrictive alternative possible to serve the asserted overriding interest.[9] *See Waller*, 467 U.S. at 48 (requiring, prior to a courtroom closure, "an overriding interest that is likely to be prejudiced [by an open proceeding and] the closure . . . be no broader than necessary to protect *that* interest," i.e., the overriding interest threatened by a public hearing (emphasis added)).

---

[9]"Like some of the tests applied to government actions under the Equal Protection Clause and First Amendment, *Waller*'s test requires a strong government interest in the closure and a narrowly tailored means of effecting it." Stephen E. Smith, *The Online Criminal Trial as a Public Trial*, 51 Sw. L. Rev. 116, 129 (2021) (footnote omitted).

Striking a proper balance means allowing at least the defendant's family to attend if possible within the parameters of the overriding interest, *see In re Oliver*, 333 U.S. at 271–72 ("[A]n accused is at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged."), as was done by other courts during COVID, *see, e.g.*, *United States v. Holder*, No. 18–cr–00381–CMA–GPG–01, 2021 WL 4427254, at *9–10 (D. Colo. Sept. 27, 2021) (court allowed limited in-person public access during COVID); *United States v. Johnson*, No. 1:21CR123, 2021 WL 3011933, at *2 (N.D. Ohio July 16, 2021) (closing voir dire to in-person spectators, but opening trial to limited number of in-person spectators); *United States v. Bledson*, No. 2:20–cr–99–RAH, 2021 WL 1152431, at *3 (M.D. Ala. Mar. 25, 2021) (allowing defendant's family to attend in person). That's because "[o]f all members of the public, a criminal defendant's family and friends are the people most likely to be interested in, and concerned about, the defendant's treatment and fate, so it is precisely their attendance at trial that may best serve the purposes of the Sixth Amendment public trial guarantee." *Tinsley v. United States*, 868 A.2d 867, 873 (D.C. Cir. 2005) (per curiam).

Here, the court's overriding interest (maintaining COVID safety protocols) was narrowly served by limiting public attendance only to the extent necessary to comply with physical-distancing requirements. But as the jury-selection process reveals, and as the district court itself recognized, additional people could fit inside the courtroom while still maintaining our COVID-19 protocols.

Eighteen potential jurors sat in the gallery during the first round of jury selection, but only thirteen jurors actually heard the case, leaving five empty seats in the gallery during trial. Five jurors sat in the jury box during the second round of selection, but no one sat in the jury box during the trial (except the victim advocate during the victim's testimony). The district court explicitly conceded there was room both in the jury box and along the back windows in the gallery for public spectators, stating, "Technically, and from a spacing standpoint, I think it would [work,] I think we can fit some people up in the jury box" and, "The only place we could possibly fit [the] public would be those benches against the back windows." Thus, according to the court's own assessment, allowing at least Brimmer's mother to attend would not have compromised its asserted overriding interest in stemming the spread of COVID-19. During trial she could have been seated in one of the five then-empty seats along the back window that had been filled with jurors during jury selection or in one of the five available seats in the then-empty jury box.[10] The court was even prepared to allow additional people who "h[ad] a purpose" in the trial, such as "another attorney," an "assistant," an "interpreter," or the victim's advocate—who the court did in fact allow to attend in person.[11]

---

[10]In all, there appear to be ten seats in the courtroom that had been used for prospective jurors that were empty during trial. The district court could have allowed three or four people in addition to Brimmer's mother and still have left over half of those seats empty.

[11]While a victim has a *statutory* right to insist on the presence of a victim's advocate, *see* Iowa Code § 915.20(2), Brimmer's right to insist on his mother's presence is *constitutional*, *In re Oliver*, 333 U.S. at 271–72.

The district court's more direct concern with seating Brimmer's mother, it seems, was its discomfort at having spectators sit near jurors in the gallery or sit closer to the witness stand than it would normally allow. As it explained:

> I don't want people from the public seated really close to the witness stand up in front where the jury box is. I don't want people from the public on either side sitting right next to or right behind the jurors because I want the jurors to feel like it's safe and that I don't want them to overhear anything. I don't want them to feel intimidated in any way.
>
> . . . .
>
> [E]ven [if the public sat in the available space in the back of the courtroom], *they're going to be seated about six feet behind the second row of jurors*, and I'm not -- I'm just not comfortable with that. I don't want -- *even if somebody says something unintentionally by reaction without any intention to cause any influence, I don't want the jurors seated that close to the public where they can overhear something that they shouldn't hear.*

(Emphases added.)

In other words, the district court was worried her presence would compromise "[t]he generic risk of jurors overhearing prejudicial remarks," a concern the Supreme Court has explicitly held cannot override a defendant's constitutional right to a public trial absent more specific findings. *Presley*, 558 U.S. at 215 ("If broad concerns of this sort were sufficient to override a defendant's constitutional right to a public trial, a court could exclude the public from jury selection almost as a matter of course."). Neither the district court nor the State cited any concrete, specific facts that would warrant concerns over "improper communications with jurors" if Brimmer's mother sat in the jury box or along the back windows, and we find none in the record. *Id.*; *see also*

*United States v. Gupta*, 699 F.3d 682, 687–90 (2d Cir. 2012) (holding that exclusion of defendant's brother and girlfriend during voir dire was not justified by " 'the large number of jurors in the *venire* panel' and the need 'to protect the panel from hearing anything about the case from any member of the public present,' " a circumstance so well acknowledged the government conceded the fact).

Thus, by simply closing the courtroom to all spectators, "the closure was far more extensive than necessary." *Waller*, 467 U.S. at 49. We recognize that the pandemic created havoc for everyone, including trial courts. We also recognize that the district court here made a sincere effort to physically reconfigure the courtroom to meet Brimmer's request to allow at least a few members of the public into the courtroom. The seating options were not ideal and ordinarily would likely not have been allowed. But when the court conceded it could do so and still comply with our physical distancing directives, it had an obligation to do more than slam shut the courtroom door. Precluding Brimmer's mother from attending in person violated his public-trial rights.

2. *The district court failed to consider reasonable alternatives to full closure.* Even if spacing limitations due to COVID did require excluding all members of the public from attending a trial in person under the second *Waller* prong, the third prong requires district courts to then consider any reasonable alternatives that would better protect defendants' rights than prohibiting all public access. Thus, when the district court here decided that COVID required it to close the trial to all in-person spectators, it was

still required to consider whether reasonable alternatives would allow at least some access for the public to view the trial to protect Brimmer's rights as much as possible. We conclude the district court also failed to satisfy this factor because it unreasonably rejected the alternative of livestreaming Brimmer's trial.

The Supreme Court has made clear that courts are obligated to consider, and provide, reasonable alternatives, regardless of whether the defendant specifically requested or offered any. *See Presley*, 558 U.S. at 214–15; *see also Allen*, 34 F.4th at 799 ("[T]he district court had an obligation to sua sponte consider alternatives 'even when they are not offered by the parties.' " (quoting *Presley*, 558 U.S. at 214)); *Moss v. Colvin*, 845 F.3d 516, 520 (2d Cir. 2017) (recognizing that *Presley v. Georgia* clarified the district court's responsibility under the third *Waller* prong to consider alternatives even if not offered by the defendant); *Johnson v. Sherry*, 465 F. App'x 477, 480 (6th Cir. 2012) ("[*Presley*] clarified that *when a party objects* to closure, but does not propose alternatives, the judge must think of some sua sponte."). So whether Brimmer requested, or even wanted, livestreaming as an alternative makes no difference in this analysis.[12]

---

[12]The State suggests in a footnote to its brief that because Brimmer did not ask for livestreaming at trial and does not push it on appeal, we should not consider it here. That livestreaming was not Brimmer's preferred method for providing a public trial does not preclude livestreaming from satisfying his demand for one. Brimmer might not have wanted livestreaming, but neither did any of the defendants in the numerous cases where courts around the country found that livestreaming saved district courts from violating the defendant's demand for a public trial. *See, e.g.*, *Bell*, 2021 WL 6110117, at *3–5 ("Asserting his Sixth Amendment right to a public trial, Bell moved to allow members of his family and the general public to observe his trial from within the courtroom. The district court [found] . . . there was no way to safely accommodate members of the public

In *Presley v. State*, the Georgia Supreme Court upheld a complete closure of Presley's voir dire, relying on "the general appellate precept that one who objects to an action of the trial court must raise the issue at the time of the trial court's action . . . or else forfeit review" to conclude that Presley was not entitled to relief because he suggested "no alternatives" to closure other than "a nebulous request for 'accommodation.'" 674 S.E.2d 909, 911–12 (Ga. 2009). On certiorari to the United States Supreme Court, the Georgia Supreme Court's reasoning was rejected because it "contravened th[e United States Supreme] Court's clear precedents." *Presley*, 558 U.S. at 209. The Court considered it well-settled "that trial courts are required to consider alternatives to closure *even when they are not offered by the parties.*" *Id.* at 214 (emphasis added). The Supreme Court's holding in *Presley* makes clear that once the public trial right is raised, courts have an obligation to provide as open a trial as possible—even if that means providing an alternative not identified, or even wanted, by the defendant.

Considering alternatives under the third *Waller* prong is a crucial part of the underlying analysis of whether any closure is narrowly tailored. *See Allen*, 34 F.4th at 798 ("The existence of reasonable alternatives . . .

---

within the courtroom[,] but livestreaming the proceedings in an adjacent courtroom satisfied the 'predominant policy considerations' of Bell's constitutional rights."). Brimmer adequately argued livestreaming as an alternative that should have been considered when he cited *Waller* and related cases in his opening brief, arguing the trial court's complete closure of the courtroom failed to consider all reasonable alternatives. And in his reply brief, he distinguished cases cited by the State that recognized livestreaming as a reasonable alternative from this case, where the court ordered a complete closure. Livestreaming as a reasonable alternative is properly before us.

sheds light on whether closure restrictions are narrowly tailored.").
"Absent consideration of alternatives to closure, . . . trial court[s] c[an] not
constitutionally close [proceedings]," *Presley*, 558 U.S. at 214 (quoting
*Press-Enter.*, 464 U.S. at 511), and "[t]rial courts are obligated to *take* every
reasonable measure to accommodate public attendance at criminal trials,"
*id.* at 215 (emphasis added). As such, courts must not only consider, but
must "accept [an] alternative when it would be reasonable to do so and
unreasonable to refuse to do so." *Gibbons v. Savage*, 555 F.3d 112, 118
(2d Cir. 2009) ("[Although] the precise words of *Waller* were that the court
is obliged to 'consider reasonable alternatives,' we do not think the
obligation is discharged if the court *considers* a reasonable alternative but
then unreasonably rejects it." (quoting *Waller*, 467 U.S. at 48)). If, under
the third *Waller* factor, a reasonable, more narrowly-tailored option exists,
failure to implement that option in favor of a less narrowly-tailored one
makes the closure fail under both *Waller* factors.

Here, we are not faulting the district court for failing to consider
extraordinary alternatives we conjured up after the fact. In fact, the district
court actually considered livestreaming as an alternative but rejected it.
Our role on de novo review is to determine whether, "in light of the totality
of the circumstances," the district court's refusal to accommodate
livestreaming complied with *Waller*'s directive to ensure closures are no
broader than necessary *and* consider all reasonable alternatives.
*Schultzen*, 522 N.W.2d at 835–36.

In *United States v. Allen*, the United States Court of Appeals for the Ninth Circuit canvassed the broad array of reasonable alternatives to complete closure courts around the country adopted to keep trials as open as possible during the pandemic. 34 F.4th at 798–99. "In determining whether the district court erred in not adopting less restrictive alternatives" to an audio-only livestream of the defendant's trial, otherwise closed to the public, the court found "the availability of [such] alternatives" persuasive in its analysis, such as "allow[ing] only a small number of public attendees"; adopting screening measures such as "temperature checks, . . . mask[s], and answer[ing] a health questionnaire"; or providing "a live video feed of the trial." *Id.* Because "other jurisdictions [had] address[ed] the pandemic using more targeted means," the Ninth Circuit concluded that "the district court . . . had 'too readily forgone options that could serve its interests just as well, without substantially burdening' Allen's public trial right." *Id.* at 799 (quoting *McCullen*, 573 U.S. at 490 (holding that a Massachusetts statute violated the Free Speech Clause of the First Amendment because it was not "narrowly tailored to serve a significant governmental interest")). Notably, that district court was considering courtroom modifications in September 2020, and other courts had figured out less restrictive alternatives to complete closure by that time.

We find *Allen*'s reasoning persuasive. Here, if the district court believed it was truly necessary to exclude all spectators from attending in person to protect against COVID, it would have been reasonable for the

district court to livestream the trial as an alternative to completely closing the courtroom, and it was therefore unreasonable not to do so. In considering livestreaming, the court stated it did not have the capabilities to stream the trial to "another courtroom or publicly somehow," otherwise it "would do that." It concluded that unless the State provided "somebody to do that," the court "can't run that" itself. While livestreaming would have posed additional work on the court, it was work that—under the circumstances—was required to ensure constitutional compliance.

First, other than two cases involving trials held in April 2020, before livestreaming was as readily available, *see Poe*, 2021 WL 5578080, at *1; *Henson*, 2021 WL 5984690, at *2–3, courts around the country consistently provided a live video or audio feed, streamed to another location within the courthouse or over the internet, as an alternative means for the public to observe the trial as it was happening. *See Allen*, 34 F.4th at 798–99 & nn. 5–6 (identifying numerous courts that had made virtual accommodations by the fall of 2020).

Second, our *July 9 Supervisory Order* directed the district court to make arrangements for livestreaming nine months prior to Brimmer's trial. His was not the first trial to be held in Dubuque County during the pandemic, and the district court admitted it had "simply closed the trial to the public" in the few trials conducted to that point, despite our directive. Whether a district court complied with relevant supervisory orders is germane to our assessment of whether it considered reasonable and less restrictive alternatives. *Compare State v. Modtland*, 970 N.W.2d 711, 722–

23 (Minn. Ct. App. 2022) (holding district court's adherence to Minnesota Judicial Branch's Preparedness Plan by configuring courtroom to comply with six-foot physical distancing requirement and livestreaming proceedings to separate courtroom open to the public showed it "considered all reasonable alternatives"), *with Allen,* 34 F.4th at 793 ("Notwithstanding" COVID-19 orders allowing limited in-person access to courtrooms, "the judge presiding over Allen's proceedings adopted additional COVID restrictions" by "preclud[ing] members of the public from entering"). It also further distinguishes this case from *Henson,* which involved a complete closure implemented *in compliance with* that court's COVID-19 administrative order. *See* 2021 WL 5984690, at *2–4.

And finally, the record reveals the district court had the capability to livestream the trial through a videoconferencing system that could have been made available to the public. It had conducted three hearings in Brimmer's case using the GoTo Meeting videoconferencing platform: a bond review hearing held on November 23, 2020; a hearing on Bon-Orduno's motion to sever held on March 1, 2021; and a hearing on the State's motion in limine held on April 5, 2021. Using the same technology the court had already used throughout Brimmer's case would have provided a reasonable alternative to excluding the public from the trial altogether. *See, e.g., United States v. Rosenschein,* 474 F. Supp. 3d 1203, 1210 (D.N.M. 2020) (using Zoom to livestream a hearing to the public); *Vazquez Diaz v. Commonwealth,* 167 N.E.3d 822, 838 (Mass. 2021)

(same); *State v. Williams*, No. 55269–8–II, 2022 WL 3043541, at *4 (Wash. Ct. App. Aug. 2, 2022) (same).

Accordingly, considering our *July 9 Supervisory Order*, the district court's colloquy about livestreaming, the fact that the district court had previously used GoTo Meeting three times in Brimmer's case alone, and the fact that federal and state courts across the country were making similar accommodations for remote access to proceedings during the pandemic, we must conclude that the district court took the easier route rather than utilizing a reasonable alternative that would have more narrowly limited the intrusion on Brimmer's right to a public trial. By April 2021, the district court should have made the trial accessible to the public via livestreaming, particularly when it closed it to all in-person spectators. It had available a reasonable alternative to cutting off all public view of Brimmer's trial, and it violated his right to a public trial when it failed to use that alternative.

**V. Remedy.**

Depriving a criminal defendant of his right to a public trial is a structural error. *See Weaver v. Massachusetts*, 137 S. Ct. 1899, 1905 (2017) (plurality opinion). Structural errors are "structural" because they affect "the framework within which the trial proceeds," "infect the entire trial process," and undermine the ultimate "determination of guilt or innocence." *Neder v. United States*, 527 U.S. 1, 8–9 (1999) (first quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991); then quoting *Brecht v. Abrahamson*, 507 U.S. 619, 630 (1993); then quoting *Rose v. Clark,*

478 U.S. 570, 578 (1986)). As opposed to "trial errors," structural errors "defy analysis under the harmless error standard." *Thongvanh v. State*, 938 N.W.2d 2, 13 (Iowa 2020).

The importance of the public-trial right is not merely an academic exercise. Its importance is precisely *why* such errors virtually always require reversal. What *is* academic when a structural error exists is whether the error actually affected the trial process. Even if, beyond a reasonable doubt, it did not, "the government is not entitled to deprive the defendant of a new trial." *Weaver*, 137 S. Ct. at 1910; *see also Lawrence*, 167 N.W.2d at 919 (reversing murder conviction and remanding for a new trial when public was unjustifiably excluded from trial during reading of jury instructions). Allowing such errors to go uncorrected simply because correcting them may be difficult or may subject witnesses to the retrial of an unsavory case erodes the fundamental character of the constitution and places our judgment as to the value of its protections in individual cases ahead of the judgment it consecrates. The violation of Brimmer's constitutional rights is therefore reversible error. *See Lawrence*, 167 N.W.2d at 919.

## VI. Conclusion.

The State presented sufficient evidence to sustain Brimmer's conviction for second-degree sexual abuse. But Brimmer's constitutional right to a public trial was violated, and he is entitled to a new trial.

**REVERSED AND REMANDED.**

McDonald, J., joins this opinion, McDermott and May, JJ., join except as to part IV.B.2, and Christensen, C.J., and Mansfield and Waterman, JJ., join only as to part III. Mansfield, J., files an opinion concurring in part and dissenting in part, in which Christensen, C.J., and Waterman, J., join. May, J., files a special concurrence, in which McDermott, J., joins.

**MAY, Justice (concurring specially).**

Ronald Brimmer had a constitutional right to a public trial. Even so, the district court declined to allow members of the public to observe. Not even Brimmer's mother.

It didn't have to be that way. The district court acknowledged that there was room for at least some spectators in the courtroom. Indeed, during jury selection, the courtroom had accommodated twenty potential jurors at a time. And after jury selection was done, the court said that additional people *could* attend if—in the court's view—those people "have a purpose" in the trial. For example, the court said that it would be permissible to have "another attorney," an "assistant," an "interpreter," or a victim's advocate in the courtroom.[13] And the court actually allowed a victim's advocate to attend during part of the trial. Yet the court refused to admit Brimmer's mother at all.

Like the majority, I believe her exclusion was a constitutional violation. "A defendant's right to a public trial is protected by both the

---

[13]When asked about whether a victim's advocate would be allowed, the court made this record:

> I should say, we have in other trials -- if [the prosecuting attorney] had another attorney from his office that wanted to sit at the table with him, even for part of the trial or *if you had another attorney or an assistant that came in, I would allow that to happen*, just not the public, and I don't really consider the advocate, who's only going to be here during the testimony of the victim and then will leave, I don't consider that to be somebody from the public. *They actually have a purpose with this trial.* It's sort of like if we needed an interpreter for one of the jurors, *we'd allow the interpreter* even though we're not allowing the public. So, yes, *I will allow the advocate.*

(Emphases added.)

United States and Iowa Constitutions." *Sothman v. State*, 967 N.W.2d 512, 528 (Iowa 2021) (citing U.S. Const. amend. VI; Iowa Const. art. I, § 10). The public trial right protects the defendant's right to have the defendant's family present. *In re Oliver*, 333 U.S. 257, 271–72 (1948) ("[A]n accused is at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged."). Indeed, "[o]f all members of the public, a criminal defendant's family and friends are the people most likely to be interested in, and concerned about, the defendant's treatment and fate, so it is precisely their attendance at trial that may best serve the purposes of the Sixth Amendment public trial guarantee." *Tinsley v. United States*, 868 A.2d 867, 873 (D.C. 2005) (per curiam). From a constitutional perspective, then, Brimmer's mother had an important purpose in the trial.

Of course, the right to public trial is not absolute. *See id.* at 874. Limits can be imposed if *all* four of these *Waller* requirements are met:

> 1) the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced,
>
> 2) the closure must be no broader than necessary to protect that interest,
>
> 3) the trial court must consider reasonable alternatives to closing the proceeding, and
>
> 4) the trial court must make findings adequate to support the closure.

*State v. Hightower*, 376 N.W.2d 648, 650 (Iowa Ct. App. 1985) (citing *Waller v. Georgia*, 467 U.S. 39, 48 (1984)).

In this case, COVID safety and overall trial fairness were certainly "overriding interest[s]" that the district court had to address. *See id.* But

the *extent* of the district court's closure—the exclusion of even the defendant's mother—was "broader than necessary to" address those concerns. *See id.* Again, the court acknowledged there was room for extra people. The court *was prepared to allow* extra people—an extra attorney, an assistant, an interpreter, a victim advocate[14]—whom the court considered to have a purpose in the trial. If there was room for them, couldn't there have been room for Brimmer's mother?

A final note on procedure: I acknowledge the dissent's points about preservation of error and waiver of arguments on appeal. But those concerns appear limited to the district court's failure to *livestream* the trial. And even if we assume Brimmer has waived any complaint about livestreaming, the same is not true of Brimmer's complaints about *his mother's exclusion.* Those complaints were preserved below and properly presented in his appellate brief. Those complaints can—and I believe should—provide grounds for Brimmer to receive a new trial—this time open to the public.

McDermott, J., joins this special concurrence.

---

[14]A victim has a *statutory* right to insist on the presence of a victim counselor, also referred to as a "victim's advocate." *See* Iowa Code § 915.20(2) (2018). But Brimmer's right to insist on his mother's presence is *constitutional. Oliver,* 333 U.S. at 271–72.

**MANSFIELD, Justice (concurring in part and dissenting in part).**

I concur in part and dissent in part. I agree there was sufficient evidence to sustain Ronald Brimmer's second-degree sexual abuse conviction as set forth in Part III of the court's opinion. I dissent from the majority's decision to order a new trial in Part IV based on a violation of Brimmer's public trial rights.

The lead opinion concedes that livestreaming the proceedings would have been a "reasonable alternative" to allowing spectators in the courtroom.[15] In fact, this alternative was approved in our court's COVID-related supervisory order. Iowa Sup. Ct. Supervisory Order, *In the Matter of Resuming In Person Court Services During COVID-19* 4–5 (July 9, 2020) [hereinafter *July 9 Supervisory Order*]. Thus, to the extent there was error below, it was in failing to make this alternative available.

But Brimmer wasn't interested in this alternative at the time of trial and isn't interested in it now on appeal. I would hold both that he failed to preserve error and that he waived any claim relating to failure to provide livestream access. And since this was the only potential constitutional error under the circumstances, I would affirm.

---

[15]Part IV.B.1 of Justice Oxley's opinion, which reverses the district court for failing to grant spectators in-person access, is joined by four members of the court and speaks for a majority. Part IV.B.2, which would also reverse the district court for failing to grant livestream access, is only joined by two members of the court. Thus, in discussing part IV.B.1, I will refer to "the majority," while in discussing part IV.B.2, I will refer to "the lead opinion."

Much of the discussion of public trial rights in the majority opinion is well-stated, and I agree with it. However, in this case, it is essentially academic. I see no reason to put someone who was serially raped by two men as a sixteen-year-old through another trial simply to make an academic point about the importance of the public trial right. The victim's impact statement is gut-wrenching and describes a suicide attempt, the loss of a job, and having "[m]y adolescence . . . ripped away from me against my will by these two men."

One other point bears emphasis. Brimmer was not "stuck in jail" awaiting trial due to forces beyond his control. Before the commencement of the pandemic, Brimmer had waived speedy trial. At the outset of the pandemic, Brimmer retracted this waiver. Brimmer then sought a bond review, and his bond was reduced to $10,000 cash or surety. Brimmer posted bond, and on August 8, 2020, he was released.[16] However, on October 26, Brimmer was charged with domestic abuse assault with injury. As a result, Brimmer was rearrested and remained in detention until his trial. While in jail, Brimmer allegedly continued to call the girlfriend he had assaulted in violation of the no-contact order. In short,

---

[16]Notably, our COVID supervisory orders encouraged judicial officers to consider available pretrial release options under Iowa Code chapter 811. *See, e.g.*, Iowa Sup. Ct. Supervisory Order, *In the Matter of Ongoing Provisions for Coronavirus/COVID-19 Impact on Court Services* 7 (May 22, 2020). Brimmer had been charged with—and was later convicted of—a class "B" felony. Originally, Brimmer's bond had been set at $25,000, the amount set forth in the uniform bond schedule for a class "B" felony. Thus, one can fairly conclude that Brimmer benefited from the court's COVID supervisory orders in obtaining a bond reduction and pretrial release—at least temporarily.

but for his own misconduct after his release, Brimmer would have been free pending trial.

## I. Background.

COVID remains an unprecedented event in our state's and our nation's history—a highly contagious respiratory disease that has killed over one million Americans and over 10,000 Iowans.[17] In 2020, national life expectancy declined by nearly two years largely because of COVID.[18] In 2021, it declined by another year.[19] In other words, by 2021, the average expected lifespan of an American was almost three years less than it had been in 2019.

On March 14, 2020, our court ordered a stop to all jury trials in the state. Iowa Sup. Ct. Supervisory Order, *In the Matter of Ongoing Preparation for Coronavirus/COVID-19 Impact on Court Services* 2 (Mar. 14, 2020). Jury trials restarted in September 2020, but following a surge in infections, our court again ordered a halt to jury trials in November 2020. Iowa Sup. Ct. Supervisory Order, *In the Matter of Ongoing Provisions for Coronavirus/COVID-19 Impact on Court Services* 1–2 (Nov. 10, 2020). Jury trials did not resume until February 2021. *See id.*

---

[17]Ctrs. for Disease Control & Prevention, *COVID Data Tracker*, https://covid.cdc.gov/covid-data-tracker/#datatracker-home [https:perma.cc/78DG-HZVD]; Iowa Dep't of Pub. Health, *COVID-19 Reporting*, https://idph.iowa.gov/emerging-health-issues/novel-coronavirus/COVID-19-reporting [https://perma.cc/GP4U-TPBG].

[18]Press Release, Ctrs. for Disease Control & Prevention, *Life Expectancy in the U.S. Dropped for the Second Year in a Row in 2021* (Aug. 31, 2022) https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2022/20220831.htm#:~:text=That%20decline%20%E2%80%93%2077.0%20to%2076.1,its%20lowest%20level%20since%201996 [https://perma.cc/N9DR-SVZP].

[19]*Id.*

Our court had previously issued the following order as to the resumption of in-court proceedings:

> If the courtroom doesn't have sufficient space to seat spectators with appropriate physical distancing, courts shall set up live feeds of public court proceedings in another room in the courthouse (or, as necessary, streaming online or by videoconference) to permit simultaneous viewing by anyone unable to attend because of space or health limitations.

*July 9 Supervisory Order* 4–5. Thus, we made clear that video access was the approved alternative when in-person access was not feasible.

April 5, 2021, the day before Brimmer's trial began, was the first day that the COVID vaccine became available to all adults in Iowa.[20] Previously, the vaccine had been rationed based on occupation, health status, and age; most adults were not eligible.[21] Moreover, most forms of the vaccine required two doses several weeks apart.[22] Thus, when Brimmer's trial commenced on April 6, only a fraction of adult Iowans had been fully vaccinated.[23]

As the COVID pandemic wore on, opinions began to diverge about how to respond to the virus. Iowans came to hold different views about the value of vaccination, face masks, and social distancing. But as a court, we

---

[20]Iowa Dep't of Pub. Health, *COVID Vaccine Administration Policy* (April 5, 2021).

[21]*Iowa Gov. Kim Reynolds Press Conference*, Iowa PBS, at 8:50–8:56 (Jan. 21, 2021) https://www.iowapbs.org/shows/governorpress/episode/3586/iowa-gov-kim-reynolds-press-conference-january-21-2021-1110-am.

[22]*See generally* Ctrs. for Disease Control & Prevention, *COVID-19 Vaccine Interim COVID-19 Immunization Schedule for Persons 6 Months of Age and Older* (Dec. 8, 2022) (providing immunization schedule for various vaccines and ages, including timelines for additional vaccine doses), https://www.cdc.gov/vaccines/covid-19/downloads/COVID-19-immunization-schedule-ages-6months-older.pdf [https://perma.cc/U46C-JJ3F].

[23]*Iowa Gov. Kim Reynolds Press Conference*, Iowa PBS, at 6:16–6:32 (Apr. 7, 2021) https://www.iowapbs.org/shows/governorpress/episode/3569/iowa-gov-kim-reynolds-press-conference-april-7-2021-1100-am.

had to take a conservative approach. In the midst of a pandemic, we were asking citizens not merely to be absent from their jobs and their regular responsibilities but also to mingle in a room with strangers for a prolonged time. We were concerned about having enough jurors willing to serve; we were concerned about our trials being the reason why a juror got sick, or worse; and we were concerned about having juries that represented a fair cross-section of the community. Juries need to include people with different perspectives, including different perceptions of risk.

**II. The District Court Did Not Commit Reversible Error in Declining to Allow Spectators to Attend the April 2021 Trial in Person.**

I would find no error in the court's refusal to allow members of the public to attend the trial in person. Missing from the lengthy majority opinion is an actual summary of the trial court record on this point. That's surprising, because the record is brief and easy to summarize.

On April 5, 2021, the day before trial, the district court—at the prosecutor's suggestion—allowed the parties to make a record on the public trial issue. The court explained that during the trial, the jury would be using the seats in the gallery to meet social-distancing requirements. The court did not believe it would be appropriate to allow spectators to sit in the same area because "those people would have to sit very close to -- either right next to or right behind the jurors." The court elaborated,

> [W]e want the jurors to feel, number one, that they don't have people sitting too close to them during this time of Covid, and, number two, that we don't have people sitting close enough to the jurors that the jurors either hear something they shouldn't hear or that the jurors feel in some way intimidated by either side.

Brimmer's counsel was asked if there was "any record [she] want[ed] to make." She raised the possibility of having spectators sit in the jury box. The court explained why this might be problematic:

> They'd be up seated in front of the bar. They would be directly behind one of the counsel tables because we've turned the counsel tables a little bit inward to face each other. They'd also be seated up front pretty close to the witness stand.

Nevertheless, the court said it would "walk around the courtroom this afternoon and think about that a little bit." In the meantime, Brimmer's counsel said she would discuss with Brimmer to discuss "whether he's really wanting to enforce his right to a public trial or what we can work out."

The next morning, as trial was to begin, the court advised the parties of its final decision:

> [L]ogistics in the courtroom make it really, really difficult to have anybody from the public in because the jurors will be evenly spaced out in the back of the courtroom, and anybody from the public is going to be seated very close to the jurors, and I've said all along that everything is not functioning perfectly ideal during Covid. One of my goals is to make this trial open to the public, but my very first goal is to make sure we have a fair trial for the State, for the Defendant and that it's fair in every way to all witnesses as well, including any witness who may testify as a victim. I don't want people from the public seated really close to the witness stand up in front where the jury box is. I don't want people from the public on either side sitting right next to or right behind the jurors because I want the jurors to feel like it's safe and that I don't want them to overhear anything. I don't want them to feel intimidated in any way.

At the end of that day, following jury selection, Brimmer's counsel made an additional record by asking that "just one person"—Brimmer's mother—be allowed to attend the trial in person. The district court

responded by asking counsel whether counsel had discussed with Brimmer the possibility of a continuance. Counsel said that her client was not interested in a continuance and pointed out that Brimmer had been incarcerated most of the time prior to trial.[24]

I find no error in the district court's decision not to allow in-person public attendance under the circumstances. The court thought carefully about the matter, even deliberating on it further overnight, and then articulated clear and cogent reasons why it wouldn't work. *See Waller v. Georgia*, 467 U.S. 39, 48 (1984) ("[T]he closure must be no broader than necessary to protect [an overriding interest that is likely to be prejudiced], the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.").

"[N]ot every courtroom closure deprives a defendant of the right to a public trial under the Sixth Amendment." *Morales v. United States*, 294 F. Supp. 2d 174, 178 (D. Conn. 2003) (finding no error in closure of courtroom during voir dire where the entire gallery space was needed for prospective jurors). The record—limited though it is—indicates that the district court had two understandable concerns. First, jurors needed to feel protected from avoidable COVID transmission. Second, it was important for jurors and witnesses not to be intimidated by the close presence of spectators. The district court is right: A fair trial is important,

---

[24]As noted, Brimmer forfeited his pretrial release when he assaulted his girlfriend.

and it can be an "overriding interest" under *Waller v. Georgia. See* 467 U.S. at 45.

COVID cases from around the country have upheld similar courtroom closures where a video stream was provided. *See United States v. Ansari*, 48 F.4th 393, 402–3 (5th Cir. 2022) (upholding closure of a May 2021 trial to the public where a video stream was provided, stating, "This reasonable and exceedingly nonintrusive means of balancing Ansari's right to a prompt public trial with the countervailing need to conduct the trial in a COVID-sensitive manner is simply not unconstitutional. . . . Because the Sixth Amendment does not require a district court to render a particularized dissertation to justify a partial courtroom closure that is reasonable, neutral, and largely trivial (i.e., requiring spectators to watch and listen on livestream rather than in-person), the district court's partial closure of Ansari's jury trial was not unconstitutional." (footnote omitted)); *Henson v. Commonwealth*, No. 2020-SC-0343-MR, 2021 WL 5984690, at *4 (Ky. Dec. 16, 2021) (holding that a digital recording is sufficient to serve the purposes of a public trial, which is for spectators to "see for themselves how their laws are impartially applied," and that supporters' in-person absences do not cause unfair prejudice against the defendant); *State v. Modtland*, 970 N.W.2d 711, 722–23 (Minn. Ct. App. 2022) (finding no public trial violation in only allowing trial participants and courtroom staff in the courtroom while also providing a live video stream); *State v. Bell*, No. A20-1638, 2021 WL 6110117, at *5 (Minn. Ct. App. Dec. 27, 2021) (holding that livestreaming a case to an adjacent courtroom did not violate

the defendant's public trial rights); *Peters v. State*, No. 82437, 2022 WL 17367580, at *1 (Nev. Nov. 30, 2022) ("In accordance with then existing health directives, the district court had an overriding interest to ensure public health and safety protections and provided the live stream alternative to ensure the right to a public trial was afforded.").

Brimmer argues that his request to have his mother alone attend the trial could have been granted. But the right is to a public trial, not a trial attended only by a relative of the defendant. The district court could not have accommodated Brimmer's mother while refusing, for example, to accommodate the mother of the victim if she wanted to attend. And, the district court explained that the problem was not simply the number of people in the courtroom but also having a mix of spectators and jurors seated in the same area. *See Bell*, 2021 WL 6110117, at *4 ("Bell relies on recent examples and persuasive federal opinions in which the court found that despite the COVID-19 pandemic, the defendant was entitled to have one or two family members present at trial. However, none of these opinions stand for the proposition that by not allowing Bell's family members in person, the district court's closure and related findings necessarily failed to satisfy the *Waller* factors.").

It is noteworthy that at the time of Brimmer's trial, some states were still not allowing jury trials *at all*. For example, Connecticut and Arkansas did not resume jury trials until June and May 2021, respectively.[25] Alaska

---

[25] *See* Statement from Chief Court Administrator Patrick L. Carroll III, Conn. Jud. Branch, *Resumption of Jury Trials in State Courts* (May 18, 2021), https://jud.ct.gov/COVID19/htm [https://perma.cc/H72T-NPV8]; *In re Response to the*

did not resume misdemeanor jury trials until April 19, and it did not resume felony trials until June.[26] Louisiana and Tennessee had only resumed jury trials as of April 1, 2021.[27]

**III. Brimmer Failed to Preserve Error in the District Court and Waived Any Argument in the Appellate Courts with Respect to Livestreaming.**

Our supervisory order provided that where in-person attendance was not possible due to social-distancing needs, "courts shall set up live feeds of public court proceedings in another room in the courthouse (or, as necessary, streaming online or by videoconference) to permit simultaneous viewing." *July 9 Supervisory Order* 4–5. "Shall," of course, is mandatory language. *Ramirez-Trujillo v. Quality Egg, L.L.C.,* 878 N.W.2d 759, 771 (Iowa 2016). And the cases from other jurisdictions suggest that livestreaming was constitutionally mandated during COVID whenever spectators could not attend in person. *See United States v. Allen,* 34 F.4th 789, 798 n.5 (9th Cir. 2022) (collecting cases). Thus, *if* the district court committed an error here, this was it.

However, it's an error that Brimmer failed to preserve. The district court was the only party to mention the subject of livestreaming. The day

---

*COVID-19 Pandemic—Resumption of Jury Trials,* 2021 Ark. 72, 1–2 (Apr. 8, 2021) (per curiam), https://www.arcourts.gov/sites/default/files/In_re_Response_to_the_COVID-19_Pandemic-Resumption_of_Jury_Trials.pdf [https://perma.cc/SLP9-9284].

[26]*See* Alaska Sup. Ct., *Special Order of the Chief Justice, Order No. 8242* 1 (Mar. 1, 2021), https://courts.alaska.gov/covid19/docs/socj-2021-8242.pdf [https://perma.cc/M4KX-PTQU].

[27]*See* La. Sup. Ct., *Order* 1 (Feb. 11, 2021); Tenn. Sup. Ct., *Order Modifying and Partially Lifting Suspension of In-Person Court Proceedings* 1 (Feb. 12, 2021), https://www.tncourts.gov/sites/default/files/docs/covid-19_revised_order_2-12-21.pdf [https://perma.cc/Q9HQ-4NFX].

before trial, the court said, "[I]f the State wants to provide somebody to do that, I'm happy to accommodate that, but I can't run that myself." At that time, and throughout trial, Brimmer's counsel never asked for livestreaming, never asked the State to provide someone to handle livestreaming, and never even mentioned livestreaming. I therefore believe Brimmer failed to preserve error on this point in the district court.[28]

The lead opinion hypothesizes that the court could have livestreamed the jury trial because the court had conducted three *non-evidentiary* hearings earlier in the case using GoTo Meeting. I'm not a technology guru (nor is the rest of our court), but that seems improbable to me. There is a difference between holding a video conference and simulcasting an in-person proceeding with multiple participants located in different places around the courtroom. Our court uses an elaborate

---

[28]In his motion for new trial, Brimmer mentioned in passing,

It would appear that since the Brimmer trial, the Court has completed a technology upgrade so that the public could view the trial from another room. This option was not made available to Defendant at the time of his trial.

Even if we consider this to be an effort to raise the issue of livestream access, it is too late. *See State v. Wells*, 629 N.W.2d 346, 356–57 (Iowa 2001) (en banc) (rejecting claims raised for the first time in a motion for new trial following conviction). I would also note that Brimmer's counsel made no reference to livestreaming when she argued the motion for new trial prior to sentencing. As before, her arguments were exclusively focused on in-person access.

I infer from the record that the failure to preserve error on livestreaming was not an oversight by Brimmer's trial counsel. Brimmer wanted his mother and other family members to attend in person "as support on [his] behalf." That's certainly a legitimate reason to ask for their presence, but it isn't one of the core purposes of the public trial right. *See Waller*, 467 U.S. at 46 (stating that the requirement of a public trial is so "that the public may see [the accused] is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions" (quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979))). Livestreaming would not have served this support role.

camera system and a camera operator to livestream our court proceedings. As the district court put it, "I can't run that myself."

In any event, we don't know what would have happened if Brimmer had pressed the issue of livestreaming, because he never did. He failed to preserve error. It would be unfair to the district court, the State, and the victim to now give Brimmer a do-over based on failure to provide a livestream that Brimmer didn't ask for, that he presumably didn't want, and that potentially could have been provided to him *if he had wanted it*.

COVID cases from other jurisdictions have indicated that public trial rights are subject to normal error preservation rules. It is not up to the district court to make arguments for the defendant. *See People v. Poe*, No. A160102, 2021 WL 5578080, at *1–2 (Cal. Ct. App. Nov. 30, 2021) (holding that a defendant's request to have his family in attendance did not preserve a public trial argument because the record did not reflect "whether [the defendant] wanted a family member to address the court or merely sought to have them present"); *State v. Jones*, 2022 WL 4074794, at *4 (Minn. Ct. App. Sept. 6, 2022) ("By simply requesting a 'split screen' display of the public-viewing area, [the defendant] did not provide the district court with an opportunity to address or correct concerns about a courtroom closure occasioned by the physical exclusion of the observers."); *see also People v. Hernandez*, 488 P.3d 1055, 1063 (Colo. 2021) (en banc) (finding that because the defendant did not raise the public trial issue below, the court would not consider it on appeal); *Martinez v. State*, 652 S.W.3d 485, 487–88 (Tex. App. 2022) (holding that the defendant waived

his constitutional argument by solely asserting statutory right to public trial).

Not only did Brimmer fail to preserve error as to livestreaming below, he also has waived the issue on appeal. I encourage anyone to read Brimmer's principal brief on appeal. It contains not a word of argument about livestreaming or video. His entire complaint is that *in-person* access was denied. In fact, the only "reasonable alternatives" that he argues are: (1) "limiting the number of persons from the public who could be present based on room capacity in light of social distancing requirements," or (2) "permitting even a single member of the Defendant's family to be present to observe trial."

When the State filed an answering brief that observed, accurately, that Brimmer had waived the issue of livestreaming, Brimmer didn't contest the point. The closest you can come to an argument in Brimmer's reply brief is a string-cite that "distinguish[es]" the State's cases. In the course of the string-cite, reference is made in some of the parentheticals to the fact that livestreaming occurred. That's not an argument, not even a half-hearted one. And it's in a reply brief, which isn't sufficient. *See Hills Bank & Tr. Co. v. Converse*, 772 N.W.2d 764, 770–71 (Iowa 2009). Tellingly, immediately after including the string-cite, Brimmer pivoted to his actual reply argument, which urged again that the court could have and should have allowed in-person access to a limited number of spectators, or at least his own family. And as before, Brimmer said nothing about livestreaming. I see no reason to go beyond the boundaries of our existing rules for a

defendant who received a fair trial and whose guilt was clearly established, as demonstrated in Part III of the majority opinion.

To be clear, I accept that "trial courts are required to consider alternatives to closure even when they are not offered by the parties." *Presley v. Georgia*, 558 U.S. 209, 214 (2010) (per curiam). The district court considered livestreaming, talked about it, and Brimmer failed to pursue it. Even now he fails to pursue it.

More important than any work we are unnecessarily creating for the judicial branch is the interest of the victim. At sentencing, after describing her painful experiences since being raped by Brimmer and Augustin Ben-Orduno, the victim said, "I am relieved that after all of the money and time that I spent to get through this, that it's finally over." Unfortunately, it isn't.

For these reasons, I would affirm Brimmer's conviction and sentence.

Christensen, C.J., and Waterman, J., join this concurrence in part and dissent in part.